IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

7/24/2024

LAURA A. AUSTIN, CLERK
BY: s/ Christel Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| AIMBRIDGE HOSPITALITY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:24-cv-00262 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| PROVIDENT GROUP – RADFORD | ) | By:   Hon. Thomas T. Cullen |
| PROPERTIES, LLC & SCHOLAR | ) |         United States District Judge |
| HOTELS LLC d/b/a SCHOLAR | ) | |
| HOTEL GROUP, | ) | |
| | ) | |
| Defendants. | ) | |

Aimbridge Hospitality, LLC ("Aimbridge") and Provident Group – Radford Properties, LLC ("Provident") entered into a contract (the "Agreement") for Aimbridge to manage Provident's Highlander Hotel in Radford, Virginia for an initial term of 10 years. Within a year of the hotel opening, however, Scholar Hotels LLC d/b/a Scholar Hotel Group ("Scholar") took over management services for the Highlander and the Agreement was terminated. Aimbridge now sues Provident and Scholar (collectively, "Defendants") to recover damages for the allegedly improper early termination of the Agreement. The matter is before the court on Defendants' motions to dismiss for failure to state a claim. After considering the parties' written arguments and its own review of relevant Virginia law, the court will deny both motions.

# I.   BACKGROUND

The facts below are taken from Aimbridge's complaint and, at this stage, are presumed true.[1] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.   The Agreement

On April 14, 2021, Provident hired Aimbridge, a large third-party hospitality management company with experience managing luxury hotels around the world, to operate and manage the Highlander. (*See* Compl. ¶¶ 5–6, 41, 43 [ECF No. 1].) In providing its services, Aimbridge was Provident's agent and the "sole and exclusive manager of the Hotel during the Operating Term." (*Id.* ¶¶ 43–45.) Aimbridge also employed each Highlander employee. (Agreement § 1.2 [ECF No. 1-1].) The Agreement's initial Operating Term began on the day the Highlander opened and was set to expire 10 years later, "unless sooner terminated in accordance with the provisions of this Agreement . . . or as otherwise provided by the written agreement of Owner and Manager." (Agreement § 3.1.) Provident had no right to "terminate [the] Agreement prior to the third . . . anniversary of the Opening Date," unless an Event of Default occurred or the Highlander was sold. (*Id.* § 13.1.) Among the 10 Events of Default specified in the Agreement, the two set forth in §§ 12.1E and 12.1J are most relevant to the instant matter. (*See* Agreement § 12; Compl. ¶¶ 49–53.)

First, an Event of Default would occur under § 12.1E if a party was "in material default in the performance of its other obligations under this Agreement, and such default continue[d] for a period of thirty (30) days after written notice from the other party." (Agreement § 12.1E.)

---

[1] Capitalized terms used but not defined in this Memorandum Opinion have the meanings ascribed to them in the Agreement.

If that cure could not reasonably be completed within 30 days, an Event of Default did not arise "if and so long as the defaulting party commence[d] the cure during such initial thirty (30) day period and thereafter diligently and continuously pursue[d] the cure thereof to completion and actually cure[d] such default within ninety (90) days after expiration of the 30 day cure period." (*Id.*)

Second, an Event of Default would occur under § 12.1J if Aimbridge "fail[ed] to maintain and operate the Hotel in accordance with the standards required under Section 2.2A" of the Agreement, and the failure was not cured within 60 days "after written notice by Owner to Manager specifying the matters or conditions which constitute[d] the basis for such Event of Default." (*Id.* § 12.1J.) If the cure could not reasonably be completed within that 60-day period, "the cure period shall be extended provided that [Aimbridge] commence[d] the cure during such initial sixty (60) . . . day period and thereafter diligently and continuously pursue[d] the cure thereof to completion within an additional sixty (60) days." (*Id.*)

Generally, once an Event of Default arose, the non-defaulting party was entitled to terminate the Agreement "on five (5) days prior written notice to the defaulting party." (*Id.* § 12.2.)

The Highlander opened to the public on April 4, 2023. (Compl. ¶ 57.) According to the Agreement, therefore, the initial Operating Term was to run from April 4, 2023, through April 4, 2033, unless terminated earlier under specified provisions of the Agreement. (*See* Agreement § 3.1.) If Provident wanted to unilaterally terminate the Agreement before April 4, 2026, absent a sale of the Highlander, it needed to comply with Section 12 of the Agreement. (*See* Agreement § 13.1.)

**B.      Termination Letters**

On January 26, 2024, Provident's attorneys sent Aimbridge a letter titled "Notice of Termination of Hotel Management Agreement." (*See* Compl. ¶ 61; January 26 Letter [ECF No. 1-3].) Provident attached to that letter a "representative list" of Aimbridge's alleged transgressions, including for certain "pre-opening activities" and "day-to-day failure of operational standards" that, according to Provident, "constitute[d] Events of Default under Sections 12.1C,[2] 12.1E., and 12.1.J" of the Agreement. (*See* January 26 Letter; January 26 Letter Ex. A.) Provident wrote that "Aimbridge has previously been made aware of these breaches and defaults yet they either remain unresolved or are of such a nature that they cannot be cured in a manner or within a period that would prevent ongoing harm to [Provident]." (January 26 Letter at 1.) Accordingly, Provident "exercise[d] its rights to terminate the Agreement, effective February 29, 2024, pursuant to Article 12 of the Agreement." (*Id.*) Provident clarified that the letter was "a formal notice of termination" and requested Aimbridge's cooperation in facilitating the transition of management. (*Id.*)

Aimbridge responded by letter on February 5, 2024. (February 5 Letter [ECF No. 1-4].) In its letter, Aimbridge disputed the factual and legal basis for Provident's attempted termination of the Agreement. (Compl. ¶ 69; *see generally* February 5 Letter.) According to Aimbridge, Provident's vague letter and list of purported transgressions failed to give Aimbridge an opportunity to cure the alleged breaches because it "provide[d] [Aimbridge] with

---

[2] An Event of Default under § 12.1C would arise "[i]f either party shall be in default in the payment of any other amount required to be paid under the terms of this Agreement, and such default continue[d] for a period of ten (10) days after written notice from the other party." The allegations in Provident's letter do not support that Event of Default, and Provident does not mention § 12.1C anywhere in its briefing for the instant motion. The court, therefore, does not discuss this Event of Default further.

no basis for understanding what, exactly, [Aimbridge] has purportedly done wrong." (February 5 Letter at 2.) Aimbridge said that, "[a]mong other issues," the list "[f]ail[ed] to specify when each alleged problem occurred; [p]rovide[d] only vague, amorphous, and conclusory assertions concerning [Aimbridge]'s purported defaults; [m]ischaracterize[d] minor, non-material issues as major, material ones; and [i]nclude[d] stale issues which occurred months ago and were fully and promptly corrected." (*Id.*) Aimbridge then challenged each item on the list and explained why, in its view, those items were insufficient to allow Provident to terminate the Agreement. (*Id.* at 2–3.) Overall, Aimbridge's letter argued that Provident's "asserted 'breaches and deficiencies' [were] pretextual and represent[ed] nothing more than an attempt to cover a termination for convenience," which was impermissible at that time. (*Id.* at 4.)

On March 7, 2024, Provident notified Aimbridge in another letter that it was terminating the Agreement on March 12, 2024, under Section 12.2 of the Agreement, due to "Aimbridge's repeated failures to cure Events of Default." (March 7 Letter at 1 [ECF No. 1-5].) The letter countered each of Aimbridge's arguments from the January 26 letter, ultimately concluding that "Aimbridge has failed to cure persistent Events of Default despite repeated notice." (*Id.* at 2–4.) Provident also stated that Aimbridge was required to "cooperate in the transition of the Hotel's management" despite its disagreement with the termination and requested that Aimbridge "turn over full control of the Hotel property the week of April 8, 2024." (*Id.* at 4.) Provident requested a confirmation of Aimbridge's cooperation by close of business on March 11, 2024. (*Id.*)

Aimbridge responded on March 11—the last correspondence in the record from the parties' letter-writing campaign—and informed Provident that it "continue[d] to reject

[Provident]'s contention that it may terminate the Agreement." (March 11 Letter at 1 [ECF No 1-6].) In the letter, Aimbridge challenged each of Provident's legal arguments and persisted in its stance that Provident's notice was inadequate and/or untimely, which precluded termination of the Agreement. (*Id.* at 1–3.) The letter then proposed a meeting between Aimbridge and Provident "with the goal of reaching a mutually agreeable business resolution of this matter," and requested Provident's response by March 13, 2024. (*Id.* at 3.)

The parties, through counsel, spoke by phone on March 12 and Provident solicited a settlement demand from Aimbridge, which Aimbridge issued on March 14. (Compl. ¶¶ 75–76.) Provident did not respond. (*Id.* ¶ 77.) The parties scheduled a telephone call a week later on March 21, but Provident cancelled at the last minute. (*Id.* ¶ 78.)

### C.     Scholar In, Aimbridge Out

On March 27, representatives from Provident (Christopher Hicks, Vice President and Vice Chairman) and Scholar (among them, the Chief Operating Officer, Vice President of Operations, Vice President of Sales, and Director of Human Resources) descended upon the Highlander to Aimbridge's surprise. (Compl. ¶¶ 80–82.) The Highlander's General Manager ("GM"), who at that point was an Aimbridge employee,[3] joined the Provident and Scholar representatives in the boardroom after Hicks allegedly falsely told him that Provident had taken legal action against Aimbridge. (*Id.* ¶¶ 83–84.) Hicks then informed the GM that Scholar was replacing Aimbridge as the Highlander's hospitality management company as of that day, and all of Aimbridge's managers and supervisors, including the GM, were hired by Scholar or

---

[3] Provident allegedly had previously tried to poach the GM from Aimbridge, but it had been rebuffed. (Compl. ¶ 88.)

Provident. (*Id.* ¶¶ 85–89.) Aimbridge asserts that it cooperated, as best it could, with the unexpected takeover. (*Id.* ¶ 90.)

According to Aimbridge, "Provident had made the decision to transition the Highlander to Scholar at least as early as February 1, 2024—if not before," and, upon information and belief, Provident and Scholar had been "engaged in negotiations concerning the takeover of the Highlander for several months." (*Id.* ¶¶ 92–93.) Aimbridge further asserts that Scholar had long been interested in being involved with the Highlander "because it fit within Scholar's core business model." (*Id.* ¶ 94.) To support that allegation, Aimbridge cites a 2020 Market Demand Study about the Highlander that Jones Lang Lasalle ("JLL") prepared for Provident. (*Id.*) In that study, JLL referenced a statement by Scholar's President and Founder that he "was interested in developing and owning the . . . [Highlander] prior to the selection of . . . Provident." (JLL Study at 31 [ECF No. 1-2].) Aimbridge alleges that, "[w]hen Provident approached Scholar with the offer to oust Aimbridge and take over management of the Highlander, Scholar did not hesitate and worked with Provident to develop a strategy" to effectuate the coup. (Compl. ¶ 95.)

### D.   Procedural History

Invoking the court's diversity jurisdiction, Aimbridge filed suit on April 19, 2024, to recover damages for Defendants' allegedly concerted effort to terminate the Agreement.[4] (*See generally* Compl.) Specifically, Aimbridge brings a common law breach of contract claim against Provident (Count One), a common law tortious interference with that contract claim against

---

[4] The parties (and the court) agree that Virginia's substantive law applies to all of Aimbridge's claims. *See NetTax, LLC v. Posso Pizza*, No. 4:23-cv-00031, 2024 WL 260501, at *7 n.7 (W.D. Va. Jan. 24, 2024) (explaining why Virginia law applies in a case with substantially similar claims).

Scholar (Count Four), and two conspiracy claims against both Defendants under the Virginia Business Conspiracy Act (Count Two) and common law (Count Three). (*Id.* ¶¶ 99–138.) Defendants moved to dismiss all of Aimbridge's claims (ECF Nos. 5, 6) and, after an extended briefing schedule, the motions are ripe for review.[5]

## II.   STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "'naked assertion[s]' devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). At bottom, the court "must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).

---

[5] The court dispenses with oral argument because it would not aid in the decisional process.

### III.   ANALYSIS

For the reasons discussed below, none of Defendants' arguments persuade the court to dismiss any of Aimbridge's claims.

### A.   Breach of Contract Against Provident

To state a claim for breach of contract under Virginia law, a plaintiff must allege "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (internal quotations omitted). A plaintiff can plead a breach of contract under different theories, including through breach of the express terms of the contract and breach of the implied covenant of good faith and fair dealing. *See Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021) (applying Virginia law). Aimbridge asserts that its complaint sets forth a breach under both of those theories; Provident contends that Aimbridge fails to allege a breach under either.

### 1.   Breach of Contractual Duty Not to Terminate Agreement Early

If a complaint establishes that a defendant complied with a contract's clear language when terminating the agreement, dismissal of a breach of contract claim predicated on an allegedly improper termination may be warranted. *See Whala v. PNC Bank, Nat'l Ass'n*, 642 F. App'x 221, 221–22 (4th Cir. 2016); *see also Regal Cinemas, Inc. v. Town of Culpeper*, No. 3:21-cv-4, 2021 WL 2953679, at *3–5 (W.D. Va. July 14, 2021); *cf. Ramos*, 770 S.E.2d at 493.

Provident contends that Aimbridge's complaint and attendant exhibits, taken as true, establish that its early termination of the Agreement unequivocally complied with the Agreement's terms. Aimbridge responds by arguing that "[f]actual issues abound" concerning

the contract's termination. (Aimbridge Mem. Opp'n at 18 [ECF No. 24].) The court agrees with Aimbridge. Because it is not the court's role to resolve the myriad factual issues at this stage, it must deny Provident's motion for this claim.

Numerous factual disputes underly Provident's termination of the Agreement, including: (1) whether Aimbridge actually defaulted as Provident alleged in its January 26 letter; (2) whether the purported defaults constituted "Events of Default"; (3) if they did, how long Aimbridge had to cure each alleged default; (4) whether the written notice was sufficient; and (5) whether Aimbridge's attempt to learn more about the defaults could be construed as a cure.[6] The court cannot resolve any of those questions in Provident's favor based on Aimbridge's pleading, so Provident's argument that its early termination of the Agreement was proper is premature.

Because it is not clear from the face of the complaint and attendant exhibits that Aimbridge unquestionably committed an Event of Default such that Provident's early termination was proper, the court cannot accept Provident's attempt to characterize the myriad factual issues surrounding the purported breach of contract claim as clear legal issues to be resolved on a motion to dismiss. Provident is correct that, without more, the court should not blindly accept Aimbridge's assertion that "the Events of Default asserted by Provident were pretextual and Provident never intended to comply with the contractual

---

[6] Neither party alleges, at this stage, that a specific provision of the contract is ambiguous. But as evident by the nature of the questions listed above, the court would be remiss if it did not point out that some of the Agreement's language may be ambiguous, which further counsels against dismissal. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) ("[C]onstruction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim."); *Va. is for Movers, LLC v. Apple Fed. Credit Union*, No. 1:23-cv-00576, 2024 WL 1091786, at *3–4 (E.D. Va. Mar. 13, 2024).

requirement to allow Aimbridge to attempt to cure any alleged breaches." (Compl. ¶ 106.) But after review of the facts as alleged in Aimbridge's Complaint and attendant exhibits, that is a reasonable inference at this stage. Aimbridge, therefore, sufficiently pleads a breach of contract claim based on Provident's termination allegedly violating the Agreement's express terms.

### 2.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Next, Provident argues that Aimbridge's breach of the implied covenant of good faith and fair dealing theory fails because a breach of the covenant cannot be premised on a party's valid exercise of its contractual rights. (Provident Mem. Supp. Mot. Dismiss at 13; Provident Reply at 12–13.)

Provident's statement of the law is correct, but its application to Aimbridge's complaint is unpersuasive. "While 'the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party.'" *Drummond Coal Sales, Inc.*, 3 F.4th at 611 (emphasis in original) (quoting *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998)) (both applying Virginia law). Importantly, this means that the covenant "does not relieve a party of the economic consequences of the terms to which it agreed." *Id.* at 612. It follows, then, that a plaintiff fails to plead a breach of contract claim based on a violation of the covenant where it only alleges that the defendant exercised contractual rights to the plaintiff's detriment. *See Johnson v. Nationwide Mut. Ins. Co.*, No. 6:22-cv-78, 2023 WL 3586438, at *3–4 (W.D. Va. May 22, 2023). But a plaintiff *can* state a breach of contract claim based on a violation of the implied covenant where it plausibly alleges that the defendant's "actions were

- 11 -

not merely unfavorable, but actually dishonest." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). Such is the case here.

Aimbridge asserts that Provident "refus[ed] to provide Aimbridge with details and information concerning the asserted 'Events of Default,'" thwarting Aimbridge's right to cure those defaults under the Agreement. (Compl. ¶ 114.) The letters attached to Aimbridge's complaint support that assertion, as Provident's initial list of supposed defaults is vague about key items, and Provident declined to meaningfully expand on the alleged defaults despite Aimbridge's request for more information. (*See, e.g.*, January 26 Letter; March 7 Letter.) It is therefore a reasonable inference at this early stage that Provident sent an intentionally vague written notice to Aimbridge to start the termination clock and frustrate Aimbridge's ability to cure those deficiencies, as was Aimbridge's right under the Agreement. Such conduct, if true, is a paradigmatic example of bad faith. *See* Restatement (Second) of Contracts § 205 cmt. d (1981) (listing "evasion of the spirit of the bargain" and "interference with or failure to cooperate in the other party's performance" as common examples of bad faith). Aimbridge's breach of contract claim, therefore, also survives under its implied covenant theory.

## B.   Tortious Interference Against Scholar

Scholar moves to dismiss the individual claim against it as well, arguing that Aimbridge fails to allege that Scholar induced the termination of the Agreement. (Scholar Mem. Supp. Mot. Dismiss at 5–7 [ECF No. 8].) The court disagrees and finds that Aimbridge has adequately alleged a plausible tortious interference claim.

To state a claim for tortious interference with a contract under Virginia law, a plaintiff must allege "(1) the existence of a valid contractual relationship . . . ; (2) the putative interferer's

knowledge of the relationship . . . ; (3) an intentional interference inducing or causing a breach or termination of the relationship . . . ; and (4) resulting damage to the plaintiff." *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019). Scholar claims that Aimbridge's complaint fails to allege facts to support the third element—that Scholar's intentional inference caused the breach of the Agreement between Aimbridge and Provident. (Scholar Mem. Supp. Mot. Dismiss at 6.)

To satisfy the causation element, a plaintiff need not allege that the defendant induced the termination "for the primary purpose of interfering with the performance of the contract.'" *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 706–07 (Va. 2009) (quoting Restatement (Second) of Torts § 766 cmt. j (1979)). Instead, "[t]he requisite level of intent also exists if the interferor 'knows that the interference is certain or substantially certain to occur as a result of [its] actions." *Comm. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212–13 (4th Cir. 2001) (quoting Restatement (Second) of Torts § 766 cmt. j). The third element is satisfied on a motion to dismiss if the facts leave the court with "little doubt that [the defendant] knew [its] conduct would interfere with [the plaintiff's] . . . contract with [a third party]." *Potomac Auto Mall Holdings, Inc. v. Blue Clover Fin., LLC*, No. 1:20-cv-865, 2021 WL 1536581, at *8 (E.D. Va. Apr. 16, 2021).

The complaint alleges that Scholar induced Provident to breach its Agreement with Aimbridge by playing an active role in helping Provident oust Aimbridge from managing the Highlander. (*See* Compl. ¶¶ 136–37.) Scholar claims that allegation fails because its purported improper collaboration with Provident is based only on speculation. Without factual allegations to support its conclusory assertion, Scholar contends, the complaint alleges that

- 13 -

Provident made its decision to terminate the Agreement *and then* approached Scholar with the opportunity to manage the Highlander. (*See* Scholar Mem. Supp. Mot. Dismiss at 6.) Under such circumstances, according to Scholar, there is no viable claim that the third-party tapped to replace the former service-provider induced the breach of contract. (*Id.*)

Scholar finds support for its argument in *Chipper Pro, LLC v. Bandit Industries, Inc*, where another court in this district dismissed a tortious interference claim under similar allegations. 616 F. Supp. 3d 525, 538 (W.D. Va. 2022). There, Judge Moon concluded that the plaintiff's complaint was devoid of "non-conclusory allegations of fact that, taken as true, would establish" the third-party's knowledge of the contract or the intent to induce its termination. *Id.* The court summarized the complaint's factual allegations as follows: "It is fair to say that [the third party] was awarded a contract to be [the defendant's] new dealer, and that [the plaintiff] was the prior dealer. And that [the defendant] and [the third party] met. But any allegations that [the defendant breached the contract] . . . allege conduct by [the defendant], not [the third party]." *Id.* (internal citations omitted). Under those circumstances and without additional facts, the court held that the plaintiff's allegations were insufficient to satisfy the causation element and dismissed the tortious interference claim. *Id.*

Though there are factual similarities between the two cases, Aimbridge alleges more than the "conclusions and conjecture" that were held to be insufficient in *Chipper Pro. See id.* The court finds particularly persuasive two sets of Aimbridge's facts that, when viewed in Aimbridge's favor—and the context of the complaint as a whole—support the inference that Scholar knowingly played an integral role in Aimbridge's ouster. First, Scholar's President and Founder, Gary Brandeis, showed "interest in developing and owning" the Highlander even

before it was completed. (JLL Study at 31.) Owning and managing a hotel are different, but it is fair to infer from that fact that Scholar has long been interested in being involved with the Highlander in some capacity. Second, the events surrounding the March 27 takeover support an inference that Scholar played an instrumental role in the plan to terminate the Agreement and had, in fact, met with Provident for several months while the Agreement was still in effect. Several of Scholar's key operational executives—including its Chief Operating Officer, Vice President of Operations, Vice President of Sales, and Director of Human Resources—were present at the hotel on March 27, 2024, to assist in the managerial transition. (Compl. ¶¶ 80–89.) It strains credulity that those high-ranking Scholar employees showed up at the Highlander unaware that they would be usurping management from Aimbridge. It is more plausible to infer that the swift, successful nature of the takeover was part of a unified strategy for Scholar to replace Aimbridge instantaneously and, in so doing, accomplish the Agreement's termination. Indeed, the fact that Scholar's Director of Human Resources was present suggests that Scholar knew it had to hire away Aimbridge's employees. Taken together, these facts support a reasonable inference that Scholar understood that its conduct would interfere with, and cause Provident to breach, the Agreement by ousting Aimbridge.

Scholar also implies that Aimbridge's claim falls short because Scholar cannot be held liable for tortious interference when its only alleged sin is business competition. That may be so, if true. *See* Restatement (Second) of Torts § 768(2) (noting legitimate business competition is not tortious interference). But the argument is premature because legitimate business competition is an affirmative defense to a tortious interference claim, *Chaves v. Johnson*, 335 S.E.2d 97, 103 (Va. 1985), and the evaluation of an affirmative defense that is not clear on the

face of the complaint is improper on a motion to dismiss, *see Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).

For all these reasons, Aimbridge's complaint asserts enough to satisfy the causation element of its tortious interference claim.[7] Scholar's motion to dismiss that claim will be denied.

### C.     Conspiracy Claims

Next, Defendants raise substantially similar arguments in moving to dismiss Aimbridge's conspiracy claims. (*See* Provident Mem. Supp. Mot. Dismiss at 7–12; Scholar Mem. Supp. Mot. Dismiss at 7–10.) Again, the court finds Aimbridge's factual allegations sufficient to support those claims and will deny Defendants' motions.

Aimbridge brings two conspiracy claims against Defendants: Statutory Business Conspiracy under Va. Code Ann. §§ 18.2-499, -500 (Count Two) and common law civil conspiracy (Count Three). The law for each claim is unique, but Defendants assert, and Aimbridge does not contest, that the elements of both claims largely overlap for purposes of the instant motions. Because the parties focus on two alleged obstacles to both common law and statutory business conspiracy under Virginia law, the court does the same for the purposes of ruling on the motions before it. *Darton Env't, Inc. v. FJUVO Collections, LLC*, 332 F. Supp. 3d 1022, 1034–35 (W.D. Va. 2018) ("Neither Plaintiff nor Defendants distinguish between the

---

[7] Scholar also argues for the first time in its Reply that it lacked knowledge of the terms of the Agreement between Provident and Aimbridge. (Scholar Reply at 11 [ECF No. 25].) This appears to be a corollary to its argument that it did not knowingly cause the breach, but to the extent it is meant as an attack on "the putative interferer's knowledge of the relationship" element of a tortious interference claim, it is unpersuasive. *L-3 Commc'ns Corp.*, 926 F.3d at 94. The court easily infers Scholar's knowledge of the contract from the alleged facts about Scholar's actions related to its management takeover.

[statutory business conspiracy and common law conspiracy] counts, and so the Court considers them together.").

"To recover in a civil conspiracy action both under the common law and under Virginia Code § 18.2-499, a plaintiff must establish that at least one member of the conspiracy, in agreement with another member, committed an act that was itself wrongful or tortious, and that such act damaged the plaintiff." *L-3 Commc'ns Corp.*, 926 F.3d at 92 (citing *Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017); *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 281–82 (Va. 1993)). For a statutory business conspiracy claim, a plaintiff must also plausibly allege legal malice, or that one of the conspiracy's purposes was to injure "Plaintiff's reputation, trade, or business." *Schlegel v. Bank of America, N.A.*, 505 F. Supp. 2d 321, 326 (W.D. Va. 2007) (citing *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001)).

Conceding the other elements for Aimbridge's conspiracy claims, Defendants argue that the complaint falls short in alleging (1) a wrongful act and (2) legal malice. Because the court finds that Aimbridge's complaint plausibly alleges both, the court will not dismiss either conspiracy claim.

### 1.    Pleading Business Conspiracy with Particularity

As a threshold matter, the parties disagree about whether Aimbridge had to plead its business conspiracy claim with particularity. Though a relatively inconsequential point of dispute between the parties—Defendants do not make any specific arguments that Aimbridge's complaint fails for lack of particularity—the court finds no basis for a general rule that Virginia business conspiracy claims must be pleaded with particularity as Defendants suggest. In so concluding, the court makes three observations.

First, the Federal Rules of Civil Procedure govern the requirements for a pleading in federal court, not Virginia's substantive law or policy. *See Faulkner v. Dillon*, 92 F. Supp. 3d 493, 500 (W.D. Va. 2015); *cf. McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 328 (4th Cir. 1996). Rule 8 covers general rules of pleading, while Rule 9 imposes a heightened standard when a plaintiff alleges "fraud or mistake." Fed. R. Civ. P. 9(b). Conspicuously absent from Rule 9 is any mention of conspiracy. The Supreme Court "recognized that the canon of *expresio unius est exclusio alterius* applies to Rule 9(b)," so the court cannot overlook that absence. *Twombly*, 550 U.S. at 576 n.3 (Stevens, J., dissenting) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,* 507 U.S. 163, 168 (1993)). Indeed, the Supreme Court applied Rule 8's general pleading standards in interpreting a Sherman Act conspiracy claim in *Twombly*, one of its most cited precedents on federal pleading requirements. *See id.* at 557. Accordingly, those principles instruct that conspiracy claims are generally held to Rule 8's pleading standards. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1233 (4th ed. 2024) ("The pleadings in a civil action for conspiracy must comply with the general requirement in Federal Rule of Civil Procedure 8 that the complaint contain a direct, simple, and concise statement that demonstrates the pleader is entitled to relief.").

Second, consistent with the above principle, heightened pleading *is* appropriate for a conspiracy claim *if* fraud (or mistake) is a requisite part of that claim. To satisfy Rule 8's pleading standards, a plaintiff must include in its complaint "a short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Because Virginia civil conspiracy claims—business and common law—require a wrongful or unlawful underlying act, a necessary component of pleading a civil conspiracy claim is adequately pleading the

underlying act. *See Comm. Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997) ("[W]ithout proof of the underlying tort, there can be no conspiracy to commit the tort."). So, if a plaintiff alleges that fraud is the underlying wrongful act for purposes of a civil conspiracy claim, it follows that it must plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 358 (4th Cir. 2012) (emphasis added) ("*Because this   component of the [plaintiffs'] conspiracy claim alleges fraud*, the [plaintiffs'] complaint must comply not only with Rule 12(b)(6) but also with Federal Rule of Civil Procedure 9(b) . . . ."); *see, e.g., NetTax, LLC*, 2024 WL 260501, at *11–12.

Third, the district court decisions that Provident cites to support that business conspiracy claims must always be plead with particularity do not carry the day (Provident Reply at 3), particularly after the Supreme Court's decisions in *Twombly* and *Iqbal*. Many opinions in the Eastern and Western Districts of Virginia that have recognized a heightened pleading rule for business conspiracy claims appear to stem largely from the same 2004 case. *See Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004) (cleaned up) ("Business conspiracy, like fraud, must be pleaded with particularity, and with more than mere conclusory language."). The case that *Google* cites for this proposition, however, makes no mention of a heightened pleading standard akin to that for fraud, but merely states a business-conspiracy plaintiff must plead the elements of his claim with more than "mere conclusory language." *See Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499–500 (E.D. Va. 2003) (tracing back to *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 802 (Va. 1985), which states that any civil conspiracy claim must be pleaded with more than "mere conclusory language," but says nothing about fraud or particularity). *Google*, of course, was decided before

- 19 -

*Twombly* (2007) and *Iqbal* (2009). And in those cases, the Supreme Court made clear that the requirement that a plaintiff allege more than "mere conclusory language" is part of Rule 8's pleading requirements, not Rule 9's heightened standard. *Iqbal*, 556 U.S. at 677–78 (cleaned up) (citing *Twombly*, 550 U.S. at 555, 557) ("The pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.").

For all those reasons, the court rejects Defendants' contention that there is a general rule that all Virginia statutory business conspiracy claims must be pleaded with particularity under Rule 9(b). As such, and because it does not allege fraud as the underlying wrongful act, Aimbridge did not need to plead its business conspiracy claim with particularity. *See Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 825–26 (E.D. Va. 2013).

## 2.    Wrongful Act

Defendants first argue that, because the alleged conspiracy is predicated on nothing more than a breach of the Agreement, the conspiracy claims must fail. Defendants are correct that Aimbridge's conspiracy claims must be dismissed if the complaint fails to plausibly allege an attendant unlawful act, and breaching a contract is not, by itself, an unlawful act. *See Dunlap v. Cottman Transmission Systems, LLC*, 754 S.E.2d 313, 317 (Va. 2014) (internal quotations omitted) ("[A]n allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose to survive demurrer."); *Station #2, LLC v. Lynch*, 695

S.E.2d 537, 541 (Va. 2010).

Aimbridge, however, does not hang its conspiracy claim on Provident's alleged breach of contract; instead, it asserts Scholar's tortious interference with the Agreement as the wrongful predicate act under both conspiracy claims. (*See* Compl. ¶¶ 126, 131 ("Provident's actions in breaching the Agreement and Scholar's actions in interfering with the Agreement represent the unlawful means of achieving the ouster of Aimbridge from the Highlander.").) Tortious interference may serve as the underlying unlawful act in a business conspiracy claim, *see Dunlap*, 754 S.E.2d at 319, and in a common law conspiracy claim, *see CaterCorp, Inc.*, 431 S.E.2d at 281-82 (Va. 1993). The Fourth Circuit recently affirmed the same when it had occasion to interpret Virginia conspiracy law:

> A stranger to the contractual or business relationship is subject to liability for a claim of tortious interference with a contract or business expectancy, as well as for conspiring to accomplish such interference. In contrast, a party to the contract or business relationship at issue may be held liable only for the act of conspiracy, when that party combines with an outsider to achieve the alleged interference.

*L-3 Commc'ns Corp.*, 926 F.3d at 91 (internal citations omitted). Because Aimbridge has stated a claim against Scholar for tortious interference with the Agreement, *see supra* § III.B, that interference is a sufficient unlawful act for Aimbridge's conspiracy claims against both Defendants.[8] *See L-3 Commc'ns Corp.*, 926 F.3d at 92 ("[S]o long as at least one co-conspirator

---

[8] Because tortious interference with the Agreement is an unlawful act for purposes of Aimbridge's conspiracy claims, it need not address Provident's argument that its ouster of Aimbridge on March 27, 2024, was not an unlawful act under Virginia's agency law. (*See* Provident Mem. Supp. Mot. Dismiss at 9–10.)

may be held liable for the underlying tortious act, the plaintiff can hold the other members of the conspiracy liable for any resulting injury.").

### 3.      Legal Malice

Defendants' second challenge to Aimbridge's conspiracy claims also fails because the court finds that Aimbridge plausibly alleges legal malice.

As a necessary element of its business conspiracy claim, Aimbridge must allege "that the conspirators acted with legal malice, i.e., intentionally, purposely, and without lawful justification" to injure Aimbridge's reputation, trade, or business. *Dunlap*, 754 S.E.2d at 317 (internal quotations omitted); Va. Code Ann. § 18.2-499(A). To allege legal malice, a plaintiff does not need to show that a conspiracy's "primary and overriding purpose was to injure the plaintiff's reputation, trade, or business, but, importantly, the plaintiff must prove that such a purpose was at least *one* of the purposes of the conspiracy." *Schlegel*, 505 F. Supp. 2d at 326 (emphasis in original) (citing *Simmons*, 544 S.E.2d at 676–77).

According to Defendants, the *only* purpose Aimbridge alleges about their conspiratorial intent is that they sought to work together further their own economic goals, and the only harm that came to Aimbridge was incidental. A couple of the complaint's paragraphs outlining Aimbridge's business conspiracy claim support Defendants' position. (*See, e.g.*, Compl. ¶¶ 124–25 (alleging that "Provident's purpose in acting with Scholar was to . . . save money," and "Scholar's purpose in acting with Provident was to oust Aimbridge and secure another university-adjacent property for its portfolio").) If those were the only allegations Aimbridge made about Defendants' conspiratorial purpose, the conspiracy claims may well fail to allege the requisite legal malice. *See Livia Props., LLC v. Jones Lang LaSalle Ams., Inc.*, No. 5:14-cv-

00053, 2015 WL 4711585, at *12 (W.D. Va. Aug. 7, 2015) (finding the plaintiff failed to allege legal malice where it alleged only that the defendant "was motivated to act as it did for economic reasons").

But the legal malice element is satisfied if any purpose of the conspiracy was to harm Plaintiff's business, and in reviewing Aimbridge's allegations to see if they allege a non-pecuniary motivation, the court considers the entire complaint. *Cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting the court "must consider the complaint in its entirety . . . when ruling on Rule 12(b)(6) motions to dismiss"). And elsewhere in the complaint—indeed, in the paragraph before Aimbridge discusses Defendants' economic motivations—Aimbridge alleges that "Provident and Scholar's actions were intentional and aimed at ousting Aimbridge from the Highlander." (Compl. ¶ 123.) Aimbridge also asserts earlier in its complaint that one of Scholar's other purposes for working with Provident was to "discredit Aimbridge's management of such properties, thereby reducing the possibility that Aimbridge would be considered as a manager for similar projects in the future, which would benefit Scholar." (*Id.* ¶ 98.)

Those allegations of Scholar's intent to (1) oust Aimbridge from a binding contract and (2) harm Aimbridge's reputation in so doing, if true, are enough to establish legal malice for the business conspiracy claim against each Defendant. *Cf. Schlegel*, 505 F. Supp. 2d at 326; *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 527 (4th Cir. 1997) (holding that Virginia's business conspiracy statute "simply requires that one party, acting with legal malice, conspire with another party to injure the plaintiff"). Defendants argue that those assertions are speculative conclusions that are insufficient to survive a motion to

dismiss. (Provident Reply at 8; Scholar Reply at 4 (both citing *Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021)).) The court disagrees, and finds that those "arguably conclusory allegations, in combination with the rest of the Complaint, sufficiently support an inference of the requisite legal malice." *Pre-Fab Steel Erectors, Inc. v. Stephens*, No. 6:08-cv-00039, 2009 WL 891828, at *16 (W.D. Va. Apr. 1, 2009).

According to Aimbridge, when Provident and Scholar's team of executives came to the Highlander on March 27, 2024, they falsely told the Highlander's GM that "there had been legal action taken by Provident against Aimbridge," and the Highlander would now be managed by Scholar. (Compl. ¶¶ 83–85.) After having rebuffed Provident's past attempts to hire the GM, the GM and the rest of Aimbridge's Highlander employees were hired by either Scholar or Provident. (*Id.* ¶¶ 86–89.) Provident and Scholar executives purportedly lying to Aimbridge's employees at the Highlander as part of a plan to hire away the employees further supports an inference that one of the conspiracy's purposes was harming Aimbridge's business. *Cf. Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 155 (Va. 1998) (finding legal malice where, among other facts, "individuals in the business conspiracy participated in a scheme to take the entire marine engineering department from [the plaintiff] and relocate the department at [the defendant]").

Finally, Scholar and Aimbridge's physical takeover on March 27 was a complete surprise to Aimbridge—last it heard from Provident, Aimbridge was to "turn over full control of the [Highlander] the week of April 8, 2024." (*See* March 7 Letter at 1.) By ambushing Aimbridge, Defendants knew that Aimbridge would not be in a position to protect its interests in the transition, further supporting an inference that part of the conspiracy's purpose was to

Case 7:24-cv-00262-TTC-CKM   Document 29   Filed 07/24/24   Page 25 of 26   Pageid#: 360

harm Aimbridge. And even if Defendants' primary purpose was to further their own bottom line, the ancillary reason of harming Aimbridge's business is enough to allege legal malice at this early stage. (Compl. ¶ 98.) Finding the complaint alleges the requisite legal malice, the business conspiracy claim will not be dismissed.[9]

### 4.      Treble Damages

Virginia's Business Conspiracy Statute permits a successful plaintiff to recover treble damages for a business conspiracy claim, Va. Code Ann. § 18.2-500(A), and Aimbridge includes treble damages in its prayer for relief on its business conspiracy claim (Compl. at 18). As part of its motion to dismiss, Provident argues that Aimbridge waived that right to seek treble damages by the terms of the Agreement. (Provident Mem. Supp. Mot. Dismiss at 12 (citing Agreement § 12.4).) Because Aimbridge did not respond to this argument (*see generally* Aimbridge Mem. Opp'n), Provident contends that any claim to treble damages should be foreclosed (Provident Reply at 9–10).

The court subscribes to the view that "the nature of the relief sought is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted." *Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 631 (W.D. Va. 2014) (citations omitted). Accordingly, as the court has previously observed, Rule 12(b)(6) is not a vehicle to dismiss certain types of damages, so the court rejects Provident's argument at this time. *See Walker v. Brooks Public Safety LLC*, No. 7:23-cv-568, 2023 WL 8676226, at *5 n.5 (W.D. Va. Dec. 15, 2023).

---

[9] For the same reasons, the court will not dismiss Aimbridge's common law civil conspiracy claim. *See Darton Env't, Inc.* 332 F. Supp. 3d at 1034–35 (analyzing business and civil conspiracy claims together).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss will be denied in their entirety.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 24th day of July, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE