IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA FILED
9/29/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| AIMBRIDGE HOSPITALITY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:24-cv-00262 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| PROVIDENT GROUP – RADFORD PROPERTIES, LLC, | ) | By: Hon. Thomas T. Cullen United States District Judge |
| | ) | |
| Defendant. | ) | |

---

Plaintiff Aimbridge Hospitality, LLC ("Aimbridge") sued Defendant Provident Group – Radford Properties, LLC ("Provident"), after Provident replaced Aimbridge as the hospitality manager of the Highlander Hotel ("the Highlander") in Radford, Virginia. Aimbridge contends that Provident, which owns the Highlander, breached their Hotel Management Agreement ("HMA") by terminating it without cause. Provident filed a counterclaim, alleging that Aimbridge separately breached the HMA through its unresponsiveness and mismanagement.[1]

These dueling breach-of-contract claims are set for trial on October 19, 2026. In advance of this trial, the court must resolve two pending motions: (1) Provident's motion to exclude Aimbridge's noticed "hybrid" fact/expert witness, Eric Benson; and (2) Aimbridge's

[1] Aimbridge also initially sued Scholar Hotels, LLC ("Scholar"), the hospitality manager that replaced Aimbridge, for tortious interference with contract and conspiracy. But the court granted Scholar's and Provident's motions for summary judgment on these other claims, leaving the breach of contract claims for trial.

motion to exclude Provident's noticed hybrid fact/expert witness, Punit Sheth.[2] (*See* ECF Nos. 63, 66.)

As explained below, the court will deny Provident's motion to exclude Mr. Benson. It will grant in part, and deny in part, Aimbridge's motion to exclude Mr. Sheth.

## I. ANALYSIS

### A. Motion to Exclude Eric Benson

Provident moves to exclude Mr. Benson, whom Aimbridge timely noticed under Federal Rule of Civil Procedure 26(a)(2)(C), from testifying about the damages Aimbridge allegedly incurred when Provident fired it as manager of the Highlander. (*See* Def.'s Supp. Disclosure [ECF No. 65-1].) In sum, Mr. Benson, who is a licensed Certified Public Accountant ("CPA") and has spent the majority of his career working in finance and accounting in the hospitality industry—including for Aimbridge—will testify about the various fee structures provided for in the parties' HMA, and the revenue Aimbridge would have earned for its management services if Provident had not terminated it. (*Id.* at 3–4.)

Provident challenges Mr. Benson's proffered expert testimony on two primary grounds: (1) that Benson's testimony, which it argues is based on simple arithmetic, would not be helpful to the jury; and (2) that Benson's opinions—i.e., his calculations of the amounts that would have been paid to Aimbridge for various management services—are not derived from reliable accounting methods. (Def.'s Br. Supp. Mot. to Exclude ("Def.'s Br.") at 1–2 [ECF No. 64].)

---

[2] These motions have been fully briefed. The court dispenses with oral argument given the impending trial date and because it would not aid its decisional process.

Federal Rule of Evidence 702 and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of expert testimony. This governing law "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017)); *see Daubert*, 509 U.S. at 597. Because expert testimony can be particularly persuasive to a jury, "the importance of the gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283 (quoting *United States v. Barton*, 909 F. 3d 1323, 1331 (11th Cir. 2018)).

Expert testimony is appropriate when the proffered witness is "qualified as an expert by knowledge, skill, experience, training or education," the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Although Provident does not challenge Mr. Benson's threshold qualifications as an accountant in the hospitality industry, it argues that his proffered testimony would nevertheless be unhelpful to the jury. According to Provident, "Benson's damages opinions consist of basic multiplication and addition that is within the common knowledge of any juror." (Def.'s Br. at 9.) Specifically, Provident contends that all Benson had to do to arrive at his damages figures was read the HMA to determine base rates specified for Aimbridge's management services, and then to apply those percentages to the Highlander's revenues, both actual and projected,

over several years. According to Provident, the jury does not need Mr. Benson to perform these "simple mathematical calculations and rudimentary arithmetic." (*Id.*)

Aimbridge counters that Provident's characterization of this methodology "grossly oversimplifies the work Mr. Benson performed to arrive at the opinions in his expert disclosure." (Pl.'s Resp. Opp. Mot. to Exclude at 2 [ECF No. 68].) The court agrees. As detailed in his expert disclosure, and later explained during Benson's deposition, he reviewed financial statements from Aimbridge and its management successor, Scholar, including accounts receivable, invoices, and proposed budgets, to determine which figures to include in his category-by-category revenue calculations. Moreover, calculating lost "Base Fees," the main driver of Aimbridge's expected revenue under the HMA, involved making a reasonable estimate, based on historical financial data, of the Highlander's revenue growth, and using that rate to project annual revenue during the third year.[3]

These calculations required far more than simple arithmetic. Instead, Benson had to review dense financial records to identify and extract the relevant accounting figures that, as part of the final steps of his analysis, were then subjected to "basic" arithmetic. Benson, in other words, utilized his trained accountant's eye to determine which financial data was integral to his computations—basic or not. While a reasonable jury should be able to use addition, subtraction, and/or multiplication to arrive at the same bottom-line figures, it would be at a loss, without some accounting background, to determine which numbers within a morass of

[3] This base fee, which was due monthly, was 2.5% of the Highlander's total operating revenue. Benson opines that Aimbridge would have earned a total of $252,484.36 in base-fee revenue from April 2024 to the end of March 2026.

financial data needed to be extracted, and then added, subtracted, or multiplied. As such, Benson's proffered testimony will unquestionably be helpful to the jury.

Provident argues, in the alternative, that Mr. Benson's proffered expert testimony is not the product of reliable principles and methods. To guide the court in its reliability assessment, *Daubert* sets out four considerations: "(1) whether the expert's theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis*, 10 F.4th at 281 (internal quotation marks omitted) (quoting *Nease*, 848 F.3d at 229). This is a "non-exhaustive" list, and the court enjoys "broad latitude to determine which of these factors (or some other unspecified factors) are reasonable measures of reliability in a given case." *Id.* (internal quotation marks omitted) (quoting *Nease*, 848 F.3d at 229). Moreover, "questions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*, 127 F.4th 437, 445 (4th Cir. 2025) (quoting *Bresler v. Wilmington Tr.*, 855 F.3d 178, 195 (4th Cir. 2017) (holding that the district court abused its discretion under Rule 702 by excluding an expert based on its disagreement with the basic facts and assumptions relied upon by the expert).

At the threshold, the court is satisfied that Mr. Benson utilized reliable accounting methods to arrive at his revenue calculations. Aimbridge's expected revenues were pegged to fixed rates for its management services—all of which are specified in the HMA. And, as Aimbridge correctly notes, these fees were to be paid regardless of the hotel's performance.

Benson, in turn, calculated these expected fees based on these negotiated rates and the Highlander's actual and projected revenues, which he gleaned from other financial records, including invoices and accounts receivable for past years, and projected budgets for future years. These calculations, all of which were anchored to the HMA itself, are paradigmatic of sound accounting principles.

Provident also argues that Benson's projections are flawed because they were primarily based on a faulty assumption—namely, that the Highlander would have remained open, under Aimbridge's management, until April 2026. According to Provident, it was unreasonable for Benson to assume as much, given the possibility that, had Aimbridge not been terminated, the Highlander would have gone out of business before then. The court disagrees. Benson's core assumption that the Highlander would remain open, under Aimbridge's management, for at least three years was eminently reasonable given the terms of the HMA, which severely restricted Provident's ability to terminate Aimbridge as manager before April 2026.[4]

Provident also argues that Benson's lost-revenue calculations are unreliable because he did not factor in the expenses that it contends Aimbridge would have incurred while managing the Highlander. But, as Aimbridge points out, that omission appears reasonable based on the

[4] While it is possible that Highlander would have closed due to lack of profitability had Aimbridge not been removed as manager, that prospect appears unlikely, at least in the short term, given the involvement of the Radford University Foundation, which owns the land underneath the hotel, the Foundation's—and Radford University's—vested interest in maintaining a hotel near campus, and the unique financing—i.e., tax-exempt bonds—Provident and its partners utilized to finance the hotel project. It seems far-fetched to assume that these stakeholders would have walked away from this multi-million-dollar hotel project because it was not as profitable as they had initially hoped. In any event, this much-less-likely contingency, and its potential effects on Aimbridge's bottom-lines, can be explored through cross-examination; it is simply not grounds for wholesale exclusion. Accounting projections often require making certain assumptions, and Benson's core assumption—the continued operation of the Highlander through April 2026—was reasonable given the terms of the HMA and Aimbridge's ultimate claim that Provident breached that agreement.

terms of the HMA, which expressly provides that Provident, and not Aimbridge, was responsible for paying most, if not all, of the expenses associated with managing the hotel, including, but not limited to, employee wages and benefits, capital improvements and repair costs, and basic expenses, like telephone use and travel. While Aimbridge, which manages over 1,200 hotels throughout the world, would undoubtedly incur some overhead expenses by also servicing the Highlander as part of its large management portfolio, that figure is not readily ascertainable from the HMA itself, or apparently from any of the other records that Benson was able to review. But given the terms of the HMA, which shift virtually all expenses to Provident, it was not unreasonable for Benson to omit that potential figure in his lost-revenue calculations.[5]

Finally, Aimbridge argues that Mr. Benson's figures are unreliable because he apparently erred in calculating the total amount that Aimbridge would have earned from three categories of set fees and erroneously "double-counted" certain fees over a three-month period.[6] Even assuming Provident is correct that Benson made some errors in his calculations, those errors are minor relative to the wide scope and overall accuracy of his financial review, which was based on reliable accounting methods. These basic computation errors, to the extent they occurred, do not otherwise vitiate the overall reliability of Benson's work. Insofar

[5] Provident can explore what impact, if any, the Highlander's pro rata share of overhead expenses had on Aimbridge's bottom line during cross-examination.

[6] Ironically, based on Provident's math, it would owe Aimbridge $8,869.09 more for these set fees than Benson calculated.

as Provident takes issue with these specific calculations, it can point out any perceived errors through vigorous cross-examination.[7]

In sum, because Mr. Benson's proffered expert testimony will certainly aid the jury in understanding relevant accounting methods and, relatedly, what Aimbridge contends it would have earned under the HMA but-for Provident's alleged breach, Provident's motion to exclude him will be denied.

**B. Motion to Exclude Punit Sheth**

Aimbridge moves to exclude Mr. Sheth, whom Provident timely noticed as a hybrid fact/expert witness under Federal Rule of Civil Procedure 26(a)(2)(C) to testify about "performance metrics" associated with the Highlander and damages suffered by Provident because of Aimbridge's alleged breach of the HMA. (*See generally* Pl.'s Mot. to Exclude ("Pl.'s Mot.") [ECF No. 66].) Sheth, who has approximately 25 years' experience working in the hotel industry, is currently employed by Preston Hollow Community Capital ("Preston Hollow"), and his day-to-day responsibilities there include monitoring the Highlander's financial performance.[8] According to his expert notice, Sheth is prepared to testify about the Highlander's financial performance, based on various categories of revenue and expenses,

[7] And insofar as Provident takes issue with Benson's characterizing the various categories of fees provided for in the HMA as "usual, customary, and reasonable within the hospitality industry," those objections are without merit given Benson's experience providing accounting services in the hospitality industry.

[8] Preston Hollow occupies a unique role in this litigation. Provident is a special-purpose entity that was created solely to own and operate the hotel. Provident is the nominal owner of the building and the named lessee under a ground lease with the Radford University Foundation. It is also designated as the borrower of the tax-exempt bonds issued to raise capital for the building's construction. Preston Hollow was Provident's primary financial backer on the project and purchased 100% of the bonds issued to fund the hotel's construction. As the controlling investor/debtholder, Preston Hollow has a substantial interest in the Highlander's financial performance and operations. Although it is not a party to the suit, it played—and continues to play—an integral role in the hotel's operation behind the scenes. Indeed, one could fairly argue that Preston Hollow is Provident's alter-ego as it relates to oversight of the Highlander.

while under Aimbridge's management, as compared to its performance under Scholar's management. (ECF No. 66-1 at 2–5.) In a nutshell, Sheth, who reviewed many of the same financial records as Mr. Benson, will explain that the hotel generated much more revenue and paid far less in expenses under Scholar than it did under Aimbridge. (*Id.*)

Aimbridge asks the court to prohibit Mr. Sheth from testifying—or, at a minimum, to limit the scope of his testimony. In doing so, it raises two principal arguments. First, Aimbridge contends that Sheth doesn't qualify as a hybrid fact/expert witness because he lacks requisite personal knowledge of the Highlander's financial performance acquired through "ground-level involvement" in the events giving rise to the lawsuit. (Pl.'s Mot. at 3.) Second, Aimbridge argues that, even if Mr. Sheth qualifies as a hybrid witness, the court should limit his opinion testimony to the four corners of his expert notice. (*Id.* at 4.) In other words, Aimbridge asks the court to prohibit Sheth from opining on matters that were not disclosed in his expert notice—primarily, his opinions that Aimbridge did not meet purported hospitality industry standards in terms of hitting key financial benchmarks in managing the Highlander, and/or that Aimbridge's mismanagement caused the purported revenue and expense disparities reflected in his comparisons. The court agrees with Aimbridge on this second ground and will limit Sheth's opinion testimony accordingly.

Under Federal Rule of Civil Procedure 26(a)(2)(B), a proffered expert who was "retained or specially employed to provide expert testimony . . . or one whose duties as the party's employee regularly involve giving expert testimony" must provide a "written report—prepared and signed by the witness." That report must include a detailed summary of the expert's opinion and the bases for it; any facts or data considered by the expert in forming his

opinions; any exhibits that will be used to support the expert's opinions; the expert's qualifications, including prior publications; a list of recent cases in which the witness testified as an expert; and, if applicable, a statement of the expert's compensation. Fed. R. Civ. P. 26(a)(2)(B)(i–vi).

"Hybrid witnesses—fact witnesses with expertise that will inform their testimony—do not fall under Rule 26(a)(2)(B)'s purview." *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 253 (4th Cir. 2022). And hybrid witnesses, who, like retained experts, typically possess specialized knowledge, training, and experience that would help the jury understand a fact at issue, may offer opinions, in addition to factual testimony, if those opinions were formed while on the job. *See id.* Although a hybrid witness need not provide a signed, detailed expert report under Rule 26(a)(2)(B), the party presenting such a witness must still disclose: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Insofar as Mr. Sheth is an employee of Preston Hollow, rather than of Provident, and began working at Preston Hollow approximately a year after the events giving rise to this lawsuit occurred, Aimbridge contends that he lacks the requisite "ground-level knowledge" of the events underlying the lawsuit to qualify, and offer opinions, as a hybrid witness. The court disagrees on this score. As noted above, Preston Hollow owns 100 percent of the bonds initially issued by Provident to finance the construction of the Highlander and thus has a vested interest in the hotel's management and continued financial viability. Sheth, in his role as Preston Hollow's director of hotel assets, directly monitors the financial performance of

the Highlander, which necessarily requires extensive coordination with representatives of Provident and the current manager, Scholar, and regular reviews of its financial records, including reported revenues and expenses—both past and present.

Although Mr. Sheth did not join Preston Hollow until 2025, or approximately one year after the lawsuit was filed, his limited tenure does not disqualify him from being able to testify, as a hybrid witness, about other matters involving the Highlander that fall squarely within his day-to-day responsibilities at Preston Hollow and are otherwise relevant to the lawsuit. While the court would bar Sheth from testifying about the events that precipitated the filing of the lawsuit—for instance, the reasons Provident fell out with Aimbridge and its subsequent decision to replace Aimbridge as hotel manager—these events are not the subject of his proffered testimony. Instead, Provident has noticed Sheth to testify about the Highlander's financial performance over a three-year period, a topic about which Sheth became intimately familiar through his job of monitoring that performance metric for Preston Hollow. In sum, Mr. Sheth has the requisite personal experience to testify about Highlander's revenues and expenses since its opening, as detailed in his notice.

But that is not the end of the inquiry. Aimbridge also argues that Sheth's expert notice is deficient, in that it fails to disclose any opinions that he intends to offer related to the Highlander's revenues and expenses, as calculated by the witness, over the relevant period. During his deposition, Sheth implied that, notwithstanding this apparent deficiency in the notice, he would expound on those revenues and expense figures, including, presumably, by opining that the hotel's subpar financial performance during its first year was caused by Aimbridge's failure to manage the Highlander according to hotel industry standards. But as

Aimbridge rightfully points out, Sheth's disclosure does not list those opinions, let alone explain the bases for them, including purported financial benchmarks in the hotel-management industry. Instead, the notice simply lists 15 separate revenue and expense calculations for the hotel, without providing additional insight into the cause or significance of the apparent disparities.[9] In that respect, the court agrees that Sheth's hybrid witness disclosure failed to satisfy Rule 26(a)(2)(C)(ii).

When a party attempts to introduce improperly disclosed expert testimony, the court considers five factors to determine whether the inadequate disclosure was nevertheless substantially justified or harmless: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) (quoting *Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d 721, 726 (E.D. Va. 2001)). The party seeking to rely on the improperly disclosed opinion bears the burden of persuasion. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). "The court need not consider every *Southern States* factor, and the court is afforded 'particularly wide latitude to [use its] discretion to issue sanctions under Rule 37(c)(1).'" *Marr v. Abercrombie & Fitch Stores, Inc.*, No. 5:14cv00123, 2015 U.S. Dist. LEXIS 98990, 2015 WL 3827326, at *6 (E.D.N.C. June 19, 2015) (quoting *Wilkins*, 751 F.3d at 222). Typical sanctions include excluding the challenged material. *See Wilkins*, 751 F.3d at 222.

[9] Aimbridge fairly characterizes these assertions as facts, rather than opinions, and takes the position that the disclosure is devoid of *any* opinions. Regardless of whether these 15 revenue and expense calculations are more accurately described as facts, rather than opinions, Sheth is qualified to testify to them.

Provident argues that, even if Sheth's notice was deficient, the court should not exclude Sheth's opinions, because Aimbridge "cannot show any surprise or prejudice, and any alleged inadequacies in Sheth's disclosure are both substantially justified and harmless." (Def.'s Resp. Opp. Mot. to Exclude at 4 [ECF No. 70].) Specifically, Provident points out that Aimbridge received Sheth's disclosure over five months ago, and that it had ample opportunity to probe Sheth's opinions as to the significance of his revenue and expense comparisons as it related to Aimbridge's management of the Highlander at his later deposition but declined to do so in any meaningful way. (*Id.* at 4–5.) Aimbridge counters that it learned of Sheth's purported opinions for the first time during his July 2026 deposition, and, because his initial disclosure was devoid of any references to purported industry standards or causation, it was deprived of the opportunity to conduct a meaningful examination of this witness's opinions. (ECF No. 74 at 7.) The court agrees.

First, the surprise to Aimbridge regarding Mr. Sheth's causation opinions supports exclusion. As noted above, Sheth's notice does not state, or even imply, that he would testify about industry standards or causation. Aimbridge first learned that this hybrid witness intended to testify about these topics—and essentially blame Aimbridge for the woeful financial performance reflected in his revenue and expense calculations—during his July 2026 deposition.

Second, Aimbridge's limited ability to mitigate that surprise also supports exclusion. Provident argues that Aimbridge could have cured the surprise at the deposition by having Sheth explain his opinions and how he arrived at them, which it elected not to do. But as Aimbridge accurately counters, it was not obligated to cure Provident's glaringly deficient

notice by examining Sheth, and trying to ferret out, his undisclosed opinions on the fly. Indeed, taking the deposition of an opposing expert requires extensive and detailed preparation; it is arguably the most challenging aspect of civil litigation. Because Sheth's notice said nothing about the opinions he broached for the first time at his deposition, Aimbridge was deprived of the opportunity *to prepare to probe* these opinions in any meaningful way. Simply put, the opposing party's opportunity to "do its best" at the later deposition is not a meaningful cure for a deficient expert disclosure. Moreover, the deposition itself occurred just days before the close of discovery, depriving Aimbridge of a meaningful opportunity to notice or retain a rebuttal expert, submit a notice or expert report, or otherwise discover evidence to counter Sheth's late-breaking opinions. *See Jamison v. Amonette*, No. 7:18cv504, 2022 U.S. Dist. LEXIS 19721, 2022 WL 326095, at *6 (W.D. Va. Feb. 3, 2022) (concluding that an expert disclosure six weeks prior to trial would require the court to reopen discovery to allow the defendants to attempt to cure the surprise, resulting in prejudice to the defendants).

Third, effective curing of the notice deficiencies would involve, at a minimum, reopening discovery just two weeks before trial. That, in turn, would necessarily require continuing the trial of this case a second time. Insofar as this litigation has been pending for nearly two-and-a-half years, further delay would undoubtedly prejudice Aimbridge. Fourth, Provident offers no explanation or valid excuse for its failure to disclose Mr. Sheth's opinions in its notice, other than the general contention that the initial disclosure itself was adequate. This also cuts in favor of exclusion. Fifth, the court is not convinced that Sheth's opinions are so important as to justify inclusion. Sheth's opinions that the hotel's financial performance over its first year fell well below the industry standard and was otherwise caused by

Aimbridge's mismanagement would be helpful to Provident's breach-of-contract counterclaim or its defense of Aimbridge's claim, but they are not essential. Indeed, Sheth's calculations about the Highlander's financial performance under Aimbridge's management, as compared to its performance under new management, largely speak for themselves. A jury can readily (and reasonably) draw the same conclusions as to the cause and significance of these disparities without having Sheth connect the dots for them.

Accordingly, the court will grant Aimbridge's motion to exclude Mr. Sheth's testimony in part. Sheth will be allowed to testify about his calculations and conclusions of the Highlander's revenues and expenses under Aimbridge's and Scholar's management, as detailed in his notice, but he will be precluded from opining as to the cause of these disparities, and/or Aimbridge's failure to manage the Highlander in accordance with hospitality-industry standards.

## II. CONCLUSION

For the reasons explained above, the court will deny Provident's motion to exclude Mr. Benson, and grant in part, and deny in part, Aimbridge's motion to exclude Mr. Sheth.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 29th day of September, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE