CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA
FILED
10/8/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

AIMBRIDGE HOSPITALITY, LLC,

Plaintiff,

v.

PROVIDENT GROUP – RADFORD PROPERTIES, LLC & SCHOLAR HOTELS LLC d/b/a SCHOLAR HOTEL GROUP,

Defendants.

Case No. 7:24-cv-00262

**MEMORANDUM OPINION**

By: Hon. Thomas T. Cullen
United States District Judge

---

After being terminated as the manager of the Highlander Hotel in Radford, Virginia, Aimbridge Hospitality, LLC ("Aimbridge") sued Provident Group – Radford Properties, LLC ("Provident"), the Highlander's owner, and Scholar Hotels LLC d/b/a Scholar Hotel Group ("Scholar"), the company that replaced Aimbridge as the Highlander's manager. Aimbridge alleged breach of contract, civil conspiracy, business conspiracy (*see* Virginia Code § 18.2-499), and tortious interference with a contract. Provident and Scholar each filed a motion for summary judgment arguing that there is no evidence to support the tortious interference and conspiracy claims. Having reviewed the record and relevant case law and considered the parties' arguments, the court agrees and will grant both motions.

## I. BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Aimbridge. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011). They are primarily taken from the deposition testimony and

exhibits produced in discovery, Provident's Statement of Facts ("PSOF" [ECF No. 52-1]), and Aimbridge's Response to Provident's Statement of Facts ("ARSOF" [ECF No. 57-7]).

**A. The Parties**

Aimbridge is a large third-party hospitality management company that manages over 1,200 properties around the world. (PSOF ¶ 5; ARSOF ¶ 5.) Scholar, the company that replaced Aimbridge as manager of the Highlander, is a hotel owner-operator with a niche in developing university-adjacent hotels. (PSOF ¶¶ 17, 20.) Scholar operates eight affiliate-owned hotel properties and serves as a third-party manager of two hotels, including the Highlander. (*Id.* ¶¶ 18–19.) Provident is a special-purpose entity of Provident Resources Group that was formed solely to own and operate the Highlander.[1] (PSOF ¶ 3.) Provident and Preston Hollow Capital financed the construction of the Highlander—a project developed by Radford University with the support of the Radford University Foundation.[2] (PSOF ¶¶ 1–2; Cox Dep. at 46:9–51:6 [ECF No. 55-1].)

**B. The Highlander**

In February 2020, when Radford University and the Radford University Foundation were first developing the concept for the Highlander, Scholar CEO Gary Brandeis expressed

---

[1] Provident is the nominal owner of the building and the named lessee under a ground lease with the Radford University Foundation. It is also designated as the borrower of the tax-exempt bonds issued to raise capital for the building's construction.

[2] Preston Hollow and the Radford University Foundation occupy unique roles in this litigation. Preston Hollow was Provident's primary financial backer on the project and purchased 100% of the bonds issued to fund the hotel's construction. As the controlling investor/debtholder, Preston Hollow has a substantial interest in the Highlander's performance and operations. Although it is not a party to the suit, it played—and continues to play—an integral role in the hotel's operations behind the scenes. The Radford University Foundation owns the land on which the Highlander was built and invested over $6 million in constructing the Highlander. Like Preston Hollow, the Radford University Foundation is a key stakeholder in the Highlander project, and its former CEO, John Cox, provided significant input on decisions Provident made regarding the management

interest in developing the hotel. (PSOF ¶ 24.) Mr. Brandeis visited the proposed site in Radford and met with stakeholders there. But, for whatever reason, he never followed up or submitted a bid. (*Id.* ¶¶ 25–26.) The Radford University Foundation looked elsewhere for a partner on the project, eventually coming to terms with Provident Resources Group. Subsequently, Provident Resources Group created Provident to own and operate the Highlander, and on April 14, 2021, Provident and Aimbridge entered a Hotel Management Agreement ("HMA") establishing Aimbridge as the manager of the new hotel. (PSOF ¶¶ 3–4; *see* ECF No. 1-1.) There is no evidence that Brandeis—or anyone at Scholar—was aware that the Highlander had been built, until three years later, when Provident's consultant contacted Brandeis about the possibility of Scholar taking over the hotel's management. (PSOF ¶¶ 27–30.)

The Highlander officially opened on April 4, 2023. (PSOF ¶ 8.) By October, the ownership group had grown increasingly dissatisfied with the Highlander's performance and profitability (or acute lack thereof) under Aimbridge's management. (PSOF ¶¶ 10–13; ARSOF ¶ 12.) Accordingly, the ownership group determined that Aimbridge was no longer a good fit for the hotel and decided to make a management change.[3] (PSOF ¶¶ 10–12; Hicks Dep. at 52:6–53:23; 60:13–16 [ECF No. 55-3].) On October 21, 2023, Provident CEO Steve Hicks informed his outside consultants, including Tony Peterman, that Provident wanted to find a new manager for the Highlander. (ECF No. 55-5 at 2.) At Provident's behest, Mr. Peterman

---

and operation of the hotel. Accordingly, the court will refer to Preston Hollow, Provident, and the Radford University Foundation as "the ownership group" throughout this Opinion.

[3] Whether Provident could *legally* replace Aimbridge under the HMA is not at issue at summary judgment, but it will be the subject of the upcoming trial.

circulated NDAs to six prospective management companies—not including Scholar. (*Id.*; *see* ECF No. 55-4 at 2.)

### C. Scholar Emerges

In late November 2023, Mr. Peterman called Mr. Brandeis to gauge Scholar's interest in managing the Highlander. (PSOF ¶ 29.) Mr. Brandeis, who was surprised to hear that the hotel had, in fact, been completed, was excited by the prospect given Scholar's niche of owning and operating university-adjacent hotels. (*Id.* ¶ 33.) Around this time, Scholar learned that Aimbridge was the current manager of the Highlander, but no one associated with Provident divulged any details of the Provident-Aimbridge business arrangement, let alone the terms of their HMA. (*Id.* ¶ 34.)

Scholar subsequently entered the competitive process of interviewing for the management position against larger hospitality companies, including Crestline. (PSOF ¶¶ 32, 39.) In December 2023, Scholar pitched the ownership group about managing the hotel. (PSOF ¶¶ 35–36.) Later that month, John Cox, the CEO of the Radford University Foundation, visited Scholar's hotel in Syracuse, New York, while traveling over the holidays. (Cox Dep. at 154:7–16.) During that visit, Mr. Cox met with Ron Balle, Scholar's Vice President of Sales and Marketing, and Robert Marino, the hotel's Director of Sales, for lunch at the hotel restaurant to discuss Scholar's interest in managing the Highlander. (ARSOF ¶ 36; Balle Dep. at 33:17–34:23 [ECF No. 55-9]; Cox Dep. at 153:2–16.) In January, Scholar attended an in-person meeting with Provident at its headquarters in Dallas. (Brandeis Dep. at 76:2–6; Balle Dep. at 39:17–23.) After presenting their final pitch and offering certain concessions, the ownership group selected Scholar to be the manager of the Highlander, instead of Crestline.

(PSOF ¶¶ 42, 45; ARSOF ¶¶ 42, 45; *see* Hicks Dep. at 83:8–84:14, 85:6–9; Cox Dep. at 170:3–172:18.) Aimbridge's HMA was never discussed throughout this process, and there is no evidence that Scholar ever saw the agreement or knew of its terms.

**D. Transitioning Scholar In, Transitioning Aimbridge Out**

Between late January and late March of 2024, Scholar was "on pins and needles" waiting to finalize its management agreement with Provident. (PSOF ¶ 89; ARSOF ¶ 89.) During this time, Scholar took steps to take over the hotel's operations; it obtained a liquor license, set up payroll, and secured insurance. (PSOF ¶¶ 64–68.) Everyone agrees that these are standard measures in any hotel-management transition, which are taken to prevent business interruption and temporary closures. (PSOF ¶¶ 65, 75–76; ARSOF ¶¶ 65, 75–76.)

In October 2023, Provident's consultant advised Aimbridge to hire Scott Marn to serve as "task force" general manager of the Highlander. (PSOF ¶ 9.) Mr. Marn, an experienced hotel manager, was a former Aimbridge employee who had recently retired to Florida. Aimbridge, at Provident's suggestion, convinced Mr. Marn to come out of retirement and assume the role of interim general manager at the hotel for a period of several months. (*Id.*) After his hiring, Mr. Marn worked with Aimbridge and Provident to attempt to resolve the hotel's operational and financial deficiencies and enhance the new hotel's standing within the local Radford community. (*See generally* Marn Dep. [ECF No. 55-2] (summarizing improvements Mr. Marn made while serving as task force general manager of the Highlander).) But Mr. Marn made it plain that he planned to return to Florida after stabilizing the hotel. (Marn Dep. at 71:4–8, 77:12–14.) Indeed, by mid-January of 2024, Aimbridge was in the process of interviewing candidates to replace him. (ECF No. 57-6 at 3.) But, unbeknownst to

Aimbridge, Provident sought to retain Mr. Marn as general manager under a new management company so that he could continue assisting the Highlander through its "heavy lifting" period. (*Id.* at 2; Marn Dep. at 77:5–11.) The ownership group communicated with Mr. Marn throughout its search process, and Tony Peterman negotiated Mr. Marn's salary as incentive to delay his retirement. (Marn Dep. at 79:8–11, 80:6–11, 81:1–6; ECF Nos. 57-5, 57-6.) But there is no evidence that Scholar participated in or was aware of these communications or negotiations between the ownership group and Mr. Marn.

Provident endeavored to keep its management transition under wraps for as long as it could. Aimbridge eventually learned that Provident intended to terminate their HMA when it received Provident's January 26, 2024 "Notice of Termination," (ECF No. 1-3), but they were not aware of the planned transition date or the identity of the new manager. (PSOF ¶ 47.) Aimbridge's transition team conducted internal calls in February to prepare for the Highlander's transition out of its management system. (PSOF ¶ 51; Liao Dep. at 237:5–238:5 [ECF No. 55-13]; Walsh Dep. at 204:5, 205:10–22 [ECF No. 55-12].) But Aimbridge formally disputed Provident's purported basis for the termination, resulting in Provident filing a lawsuit in state court against Aimbridge two weeks before the takeover date. (PSOF ¶ 56.)

Importantly, the record is devoid of any evidence that Scholar was aware of the Notice of Termination or that Aimbridge had taken the position that Provident was in breach of the HMA in trying to remove it as manager. It is undisputed that Scholar had no direct contact with Aimbridge personnel prior to the takeover date. (Sharma Dep. at 66:18–67:19 [ECF No. 55-8]; Walsh Dep. at 210:21–211:1.) Although Provident informed Scholar that Aimbridge's and Provident's counsel were hashing out the details of the management transition, Provident

assured Scholar that all was well and that they would soon reach an amicable resolution with Aimbridge. (ECF No. 55-15; Brandeis Dep. at 91:17–21.)

### E. The Transition Day

On March 26, 2024, Scholar and Provident finalized their HMA. (PSOF ¶ 88.) The following day, Scholar and Provident representatives arrived at the Highlander to affect the management transition. (Marn Dep. at 89:19–24.) These representatives held an introductory meeting with Aimbridge's hotel employees, and instructed Mr. Marn to inform Aimbridge that the transition was in progress. (McNeely Dep. at 102:11–15 [ECF No. 57-3]; Marn Dep. at 86:1–11, 85:11–29.) As part of this process, Scholar's human resources representative, Jennifer Martin, began onboarding all of Aimbridge's property-level employees, including the housekeepers, cooks, waitstaff, desk clerks, and Mr. Marn. (PSOF ¶¶ 77, 79–85; ARSOF ¶¶ 77, 79–85.) Nearly all members of staff agreed to transition to Scholar's management and continue to work at the hotel. (PSOF ¶ 92; ARSOF ¶ 92.) Within two days, Scholar completed its onboarding of the former Aimbridge employees and assumed the role of new manager of the Highlander. (Martin Dep. at 63:13–22, 73:15–74:8 [ECF No. 57-2].)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment under Rule 56 "allows a case to be resolved before and without a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). "The court's role in ruling on such a motion is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding

facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.* at 352–53 (citations omitted).

In deciding a motion for summary judgment, "the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022) (internal quotation marks omitted). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if there are genuine disputes of material fact and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, but is appropriate "when the evidence is so one-sided that one party must prevail as a matter of law," *Tekmen*, 55 F.4th at 959 (internal quotation marks omitted).

## III. DISCUSSION

### A. Tortious Interference with a Contract

In this diversity action, the court applies the substantive law and choice-of-law rules of the state in which it sits; in this case, Virginia. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166

F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)).

Under Virginia law, to establish tortious interference with contractual relations, the plaintiff must demonstrate "(1) the existence of a valid contractual relationship . . . ; "(2) knowledge of the relationship . . . on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship . . . ; and "(4) resultant damage to the party whose relationship . . . has been disrupted." *Com. Funding Corp. v. WorldWide Sec. Servs. Corp.*, 249 F.3d 204, 210 (4th Cir. 2001) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). To survive summary judgment, a plaintiff must demonstrate that a reasonable jury could find that the plaintiff presented a prima facie case for tortious interference with contractual relations. *Com. Funding Corp.*, 249 F.3d 204 at 212.

Here, only the third element—intentional interference inducing or causing a breach or termination of the relationship—is in dispute. In support of their motions for summary judgment, Scholar and Provident argue that Aimbridge cannot establish that (i) Scholar intended to interfere with Aimbridge's HMA; or that (ii) Scholar "induced or caused" Provident to breach its HMA with Aimbridge. (*See* Scholar's Br. Supp. Mot. Summ. J. ("Scholar's Br.") at 8, 12 [ECF No. 54]; Provident's Br. Supp. Mot. Summ. J. ("Provident's Br.") at 9 [ECF No. 52].) Aimbridge counters that the record supplies sufficient circumstantial evidence from which a reasonable jury could infer (i) that Scholar possessed the requisite knowledge for intent to interfere with Aimbridge's HMA; and (ii) that Scholar caused

Provident to breach its agreement with Aimbridge. (*See* Pl.'s Br. Opp. Mot. Summ. J. ("Pl.'s Br.") at 14 [ECF No. 57].)

**1. Intentional Interference**

Scholar is entitled to summary judgment on the tortious interference claim because the evidence does not raise a genuine factual dispute about Scholar's intent to interfere. Stated differently, there is no evidence in the record that would allow a reasonable jury to infer that Scholar knew that its actions would cause Provident to breach its HMA with Aimbridge.

To establish an intent to interfere, a plaintiff must demonstrate that the defendant "knows that the interference is certain or substantially certain to occur as a result of his [or her] actions." *Com. Funding Corp.*, 249 F.3d at 212–13 (quoting Restatement (Second) of Torts § 766 cmt. j.) The defendant must know of both the contract's existence *and* of the fact that it was interfering with the contract. *Id.* at 212. The requisite level of intent is not limited to circumstances in which the tortfeasor acts with the "purpose of" or "desire to" interfere with the plaintiff's contractual relationship. *Id.* Virginia law defines the contours of this lower standard of intent to include "an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *See DuretteBradsaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 707 (Va. 2009) (citing Restatement (Second) of Torts § 766 cmt j.)

In *Chaves v. Johnson*, a seminal case on the law of tortious interference in Virginia, the Supreme Court of Virginia found that architect H.C. Johnson, Jr.'s actions amounted to intentional interference. 335 S.E.2d 97, 104 (Va. 1985). In that case, Johnson hand delivered letters to several city councilmen after the city rejected his bid for an architectural services

contract in favor of Chaves, a rival, and, in Johnson's estimation, less experienced, architect. *Id.* at 98–99. In his letters, Johnson petitioned the city council to reconsider his bid, highlighted his qualifications, and indicated that Chaves was inexperienced and that his fees were excessive. *Id.* at 100–01. Ultimately, after considering Johnson's letters, the city council voted to terminate Chaves' contract and select Johnson for the job. *Id.* at 101. The court held that "the interferor's knowledge of the business relationship, and his intent to disturb it[,] are requisite elements" of a tortious interference claim, concluding that Johnson's actions evinced the requisite intent to interfere. *Id.* at 101–02.

Similarly, in *Commerce Funding Corporation*, the Fourth Circuit, applying Virginia law, found that the defendant's conduct demonstrated the requisite intent for a tortious interference claim. 249 F.3d at 207. In that case, Worldwide, a financial services company that had loaned money to Commerce, entered into an agreement with Commerce under which Commerce would collect Worldwide's account receivables until the outstanding debt was satisfied. *Id.* Southern, which had a security interest in those accounts receivable, learned of this agreement between Worldwide and Commerce and, six days later, contacted Commerce and demanded payment of the amount that was promised to Worldwide. *Id.* at 213. The court noted that Southern was "on notice" that Commerce was withholding funds from Worldwide because of Southern's claim to entitlement yet refused to withdraw its claim to the funds. *Id.* Accordingly, the court concluded that Worldwide had satisfied the intent element of its claim because Southern "was at least substantially certain that it had interfered" with Worldwide's

contract and that it would continue to interfere with the contract if it refused to take back its claim to the funds. *Id.*

Unlike the plaintiffs in *Chaves* and *Commerce Funding Corporation*, Aimbridge has not adduced any evidence that Scholar knew that its decision to assume a management role, in response to Provident's invitation, would cause or induce a breach of the Provident-Aimbridge HMA. Although Scholar was aware that Aimbridge had an HMA with Provident (as no management company in the industry would ever operate a hotel without one), the intent requirement demands more than mere knowledge that a contract exists. Rather, a plaintiff must show that the defendant had some knowledge that their actions will result in a breach or material noncompliance with that contract. *See Com. Funding Corp.*, 249 F.3d 204 at 212–13; *Chaves*, 335 S.E.2d at 102 ("[C]onduct is tortious . . . if [the tortfeasor] induces the third party to breach an existing contract which is not terminable at will.").

But the uncontroverted evidence establishes that hotel management transitions are routine occurrences in the hotel industry and certainly not events from which a breach or noncompliance with an HMA is "substantially certain" to result. *See Com. Funding Corp.*, 249 F.3d at 212–13. There is simply no evidence—direct *or* circumstantial—that Scholar ever saw or knew the terms of Aimbridge's agreement with Provident, such that Scholar was on notice that its continued course of action—accepting Provident's offer to step in as hotel manager—would cause Provident to breach its HMA with Aimbridge. *See id.* Accordingly, no reasonable jury could find that Scholar knew that its agreement to manage the Highlander would induce

a breach of Provident's contract with Aimbridge. Therefore, Aimbridge's tortious interference claim fails on this ground alone.

**2. Proximate Causation**

But even if there was some evidence establishing intent to interfere on Scholar's part, Scholar is nevertheless entitled to summary judgment on the tortious interference claim because Provident made the independent decision to terminate its HMA with Aimbridge.

To defeat summary judgment, a plaintiff must also point to facts in the record from which a reasonable jury could conclude that the defendant "induc[ed] or caus[ed] a breach or termination of the relationship or expectancy." *Chaves*, 335 S.E.2d at 102. Virginia law requires more than but-for causation; rather, it demands a showing of "affirmative action that is the proximate cause of the breach." *OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 529 (4th Cir. 2017) (citing *Lockheed Info. Mgmt. Sys. Co. v. Maximus, Inc.*, 524 S.E.2d 420, 432–33 (Va. 2000)). A showing that the third party made an "independent decision" to breach its contractual duty is enough to defeat a claim of tortious interference under Virginia law. *Id.* at 529.

In support of their motions for summary judgment, Scholar and Provident contend that Provident made its decision to terminate Aimbridge's HMA wholly independent of Scholar's decision to accept Provident's offer to manage the hotel. (*See* Scholar's Br. at 12; Provident's Br. at 9.) Aimbridge argues that Scholar's involvement *did* cause the breach of Aimbridge's HMA, because the takeover could not have occurred had Scholar not been "ready, willing, and able" to replace Aimbridge as manager after it was fired. (Pl.'s Br. at 14.)

Virginia law rejects mere "but-for" causation to satisfy the causation element of a tortious interference claim.[4] In *Peterson v. Cooley*, for example, the Fourth Circuit failed to find causation where Central Fidelity Bank broke off negotiations with the plaintiffs, their debtor clients, due to their failure to remain current on their loan payments. 142 F.3d 181, 187 (4th Cir. 1998). Although Cooley had expressed interest in negotiating with Central Fidelity over the loan package, the court nevertheless found that the plaintiff lost its opportunity to negotiate independent of Cooley's involvement. *Id.* Further, the court noted that, by the time Cooley contacted the bank, the bank was interested in selling the loan package to other investors in addition to Cooley. *Id.*

In *OpenRisk, LLC, v. Microstrategy Services Corporation*, the Fourth Circuit similarly rejected OpenRisk's theory that Microstrategy induced or caused OpenRisk's former employees to breach their contractual duties. 876 F.3d at 528–29. OpenRisk argued that Microstrategy had made it possible for its former employees to use OpenRisk's data in violation of their non-use obligation by transferring OpenRisk data to a cloud environment that the employees had established. *Id.* at 528–29. But the court characterized this scenario as merely "but-for" causation, because the employees' decision to breach their duties to

---

[4] At oral argument, Aimbridge cited *Adnet, Inc. v. Soni*, to support the proposition that "but-for" causation is sufficient to establish a tortious interference claim. 66 F.4th 510, 520 (4th Cir. 2023) ("[T]here is evidence of a reasonable certainty that but for Defendants' intentional misconduct . . . Adnet would have been awarded the subcontract."). No party cited this case in their briefs, and Scholar and Provident did not have an opportunity to review the case prior to the court's decision. Even so, this case supports well-established Fourth Circuit precedent that proximate cause is required for a tortious-interference claim. Though the court uses the term "but for" in its causation analysis, the rest of the passage adopts the proximate-causation reasoning. *See id.* ("Additionally, there is no evidence that GDIT planned to compete the subcontract prior to Defendants reaching out to GDIT. Instead, GDIT decided to compete the contract *only after* Defendants informed GDIT that RoLaJa could perform under the subcontract.") (emphasis added).

OpenRisk by using its intellectual property was made independent of Microstrategy's role in effectuating their breach. *Id.* at 529.

The Supreme Court of Virginia's decision in *Century-21 v. Elder* is particularly persuasive and underscores the fundamental weakness of Aimbridge's tortious interference claim. 391 S.E.2d 296, 299 (Va. 1990). In that case, a homebuilder alleged that a real estate agent had induced or caused her clients to breach their real property contract to purchase a new home, even though the agent's clients had signed this first contract without the agent's knowledge, and, once the agent learned of its existence, she had warned her clients that their decision to sign a second contract to purchase a different home would put them in breach of the first contract. *Id.* The court ultimately sided with the realtor, finding that her actions in preparing the second contract and helping them close on that home were solicited by her clients, and not caused by any affirmative act on her part. *Id.* In so doing, the court reasoned that the real estate agent's actions, which included showing her clients the second home, preparing a contract, and setting the closing date, were purely responsive to the requests and directives and did not qualify as affirmative actions that would constitute inducement or causation of their breach of contract. *Id.* Insofar as *Elder* is binding precedent in this matter, it forecloses any claim by Aimbridge that Scholar proximately caused the breach of the Provident-Aimbridge HMA. Simply put, if the agent in *Elder*, who, unlike Scholar, actually knew that her clients would be in breach of an existing contract when she prepared a second contract, was not deemed by the Supreme Court of Virginia to have proximately caused her client's breach, then Scholar, who had no knowledge of a potential breach, cannot be held responsible as a matter of law.

Conversely, in *Commerce Funding Corporation*, the Fourth Circuit found that the plaintiffs *had* established proximate causation. 249 F.3d at 213. There, the court reasoned that Southern's letter staking its claims to Worldwide's funds "actually caused" Commerce to withhold the accounts receivable from Worldwide and satisfied proximate cause. *Id.* Similarly, in *Chaves*, the Supreme Court of Virginia found proximate causation based on testimony that H.C. Johnson's opinions on Chaves's inexperience and unreasonable fees informed the city council's decision to terminate Chaves's contract. 335 S.E.2d at 104.

But Scholar's actions in this case are a far cry from those of the defendants in *Commerce Funding Corporation* or *Chaves*. The undisputed facts conclusively establish that Provident made the decision to terminate Aimbridge on its own— *before* Scholar was invited to enter the selection process. *See, e.g.*, *Peterson*, 142 F.3d at 187 ("[T]he Petersons' own default led to the end of their negotiations with Central Fidelity, not any allegedly improper interference on the part of the defendants.")

The chronology of what precipitated the alleged breach in this case is dispositive. In October 2023, six months into Aimbridge's term as manager of the Highlander, Provident informed its consultants that Provident was searching for new management for the hotel. By that time, Mr. Peterman had circulated NDAs to six other hospitality companies—but not Scholar. One month later, Mr. Peterman initiated contact with Mr. Brandeis and Scholar decided to bid for the management position. As much as Aimbridge resists this conclusion,

there is simply no evidence that Scholar was aware of the Highlander's existence prior to that phone call.[5]

From there, Scholar's actions, such as presenting their management pitch to Provident and preparing for the management transition, were purely in response to the competitive interview process Provident initiated and, once Scholar was selected, expected of it. *See Century-21*, 391 S.E.2d at 299 (refusing to find causation where the real estate agent's alleged interfering actions were taken in response to requests by the party breaching their third-party contract); *OpenRisk, LLC*, 876 F.3d at 529 (failing to find that Microstrategy induced or caused the parties' independent decision to breach their contractual duties though its actions made the breach possible). Further, there is no evidence that Scholar ever discussed Aimbridge during the selection process or preparation period. *See, e.g.*, *Chaves*, 335 S.E.2d at 103 ("The tort complained of here is an intentional wrong to the property rights of another, accomplished by words . . . employed in pursuance of a scheme designed wrongfully to enrich the speaker at the expense of the victim.").

Although Aimbridge initially brought this tortious interference claim against Scholar based on the reasonable hunch that its designs on the Highlander and approach to Provident were the impetus for Provident's decision to terminate their HMA, that hunch was vitiated by

---

[5] In a last-ditch effort, Aimbridge references a database of university-market hotels created by Scholar interns that lists Radford University among other universities throughout the United States. (ARSOF ¶¶ 28–30; *see* ECF No. 57-4 at 2, 5, 7.) Everyone agrees that the Highlander is not listed *anywhere* in the database. In fact, at oral argument, Defendants noted that the legend on the database indicates "no targets" where Radford University is listed. Despite there being no evidence to support its contention, Aimbridge speculates that Scholar knew of the Highlander before November 2023 based on the existence of the database, alone. (Pl.'s Br. at 27–28.) As Scholar and Provident aptly note, this kind of speculative reasoning is not sufficient to defeat summary judgment. (Scholar's Reply Br. at 9–10, 14–15 [ECF No. 60]; Provident's Reply Br. at 8 n.11, 15–16 [ECF No. 61].)

the facts developed in discovery. Instead, the undisputed record conclusively establishes that Provident's decision to terminate Aimbridge arose before Provident's agent ever contacted Scholar. And Scholar only became involved with the Highlander *because* of Provident's decision to part ways with Aimbridge. Regardless of whether Scholar was interested in the opportunity, which it understandably was, Provident was wholly dissatisfied with Aimbridge's performance as the Highlander's manager and had resolved to replace Aimbridge with another management company, whether Scholar or some other entity. *See Peterson*, 142 F.3d at 187. The record is devoid of evidence from which a reasonable factfinder could find that Scholar induced or caused Provident's decision to terminate Aimbridge. Accordingly, Aimbridge's tortious interference claim also fails on proximate causation.

**B. Conspiracies**

It logically follows then that Scholar and Provident are entitled to summary judgment on both conspiracy claims. "To recover in a civil conspiracy action both under the common law and under Virginia Code § 18.2-499 [Virginia's business conspiracy statute], a plaintiff must establish that at least one member of the conspiracy, in agreement with another member, committed an act that was itself wrongful or tortious, and that such act damaged the plaintiff." *L-3 Commc'n Corp. v. Serco, Inc.*, 926 F.3d 85, 92 (4th Cir. 2019) (citation omitted). "[S]o long as at least one co-conspirator may be held liable for the underlying tortious act, the plaintiff can hold the other members of the conspiracy liable for any resulting injury." *Id.* "Whether a conspiracy caused the alleged damage ordinarily is a question for the jury." *Com. Bus. Sys. Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995) (citing *Middlesboro Coca-Cola v. Campbell*, 20 S.E.2d 479, 482 (1942)). Virginia's business conspiracy statute additionally requires the

plaintiff to establish that the conspirators acted with legal malice, which must be shown by clear and convincing evidence as opposed to the more traditional preponderance-of-the-evidence standard. *Id.*; *Simmons v. Miller*, 544 S.E.2d 666, 676–77 (Va. 2001).

Because the court finds that Aimbridge's tortious interference claim fails as a matter of law, there is no predicate wrongful act to support Aimbridge's civil conspiracy claim. *See Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010) (holding that a conspiracy to breach a contract without the violation of independent statutory or common law duties is not sufficient to support a business conspiracy claim). Accordingly, Provident and Scholar are entitled to summary judgment on the civil conspiracy claim.

As to Aimbridge's business-conspiracy claim, Aimbridge has also failed to raise a genuine dispute of material fact that would allow a reasonable jury to find legal malice. To demonstrate legal malice, the plaintiff must show that at least one of the defendants acted "intentionally, purposely, and without lawful justification" to injure the plaintiff's reputation, trade, or business. *Com. Bus. Sys. Inc.*, 453 S.E.2d at 267. A plaintiff is not required to prove that the defendant's "primary and overriding purpose" was to injure the plaintiff's reputation, trade, or business, *id.*, but the plaintiff must establish that such a purpose was one of the goals of the conspiracy, *Simmons*, 544 S.E.2d at 676–77.

In support of their motions for summary judgment, Provident and Scholar maintain that their actions were motivated by legitimate business interests:[6] Provident was motivated

[6] Provident and Scholar's "legitimate business interest" argument is well-founded in this Circuit's case law. *See Livia Props., LLC v. Jones Lang LaSalle Ams., Inc.*, No. 5:14-cv-53, 2015 WL 4711585, at *12 (W.D. Va. Aug. 7, 2015) ("Livia alleges that Comcast was motivated to act as it did for economic reasons suggesting a legitimate[,] non-malicious motive."); *Peterson v. Cooley*, 142 F.3d 181, 188 (4th Cir. 1998) (finding no legal malice where Cooley acted for "the legitimate business purpose of protecting his RTC judgment" and "out of a legitimate business desire to profit."); *DAG Petroleum Suppliers, LLC v. BP PLC*, 452 F. Supp. 2d 641, 650 (E.D. Va. 2006)

by a desire to keep the Highlander, which was in precarious financial shape, afloat, and Scholar's actions were merely a response to an invitation to expand its burgeoning business. (Provident's Br. at 16–17; Provident's Reply Br. at 15.) Similarly, Scholar and Provident argue that any actions taken to facilitate that transition, such as keeping the transition quiet and the hiring of the hotel employees, were motivated by ordinary business purposes rather than any desire to harm Aimbridge. (Provident's Br. at 17–19.) Aimbridge counters that, even if Scholar and Aimbridge acted to further legitimate business interests, these motivations do not preclude a finding of an intent to injure Aimbridge's business. (Pl.'s Br. at 23.)

Here, Aimbridge has not adduced any evidence that Provident and Scholar's actions were motivated by an intent to injure its business. For its part, Aimbridge argues that malice can be inferred from Scholar's status as its business competitor. (Pl.'s Br. at 24.) But there is simply no evidence, direct or circumstantial, that Scholar, a ten-hotel owner-operator, considered Aimbridge, a management company with over 1,200 properties, to be a competitor. But even if one could reasonably ascribe some competitive motive to Scholar's actions, competition alone does not demonstrate, and certainly not to the magnitude of clear and convincing evidence, that Scholar had a motive *to harm Aimbridge's business* as a competitor or rival. *See DAG Petroleum Suppliers, LLC*, 452 F. Supp. 2d at 650.

Next, Aimbridge contends that Provident's secrecy in conducting the management transition was done with an intent to harm Aimbridge's business. (Pl.'s Br. at 25–26.) The court disagrees. There is simply no evidence that Provident sought to replace Aimbridge because it

(finding that intent to make a profit "can hardly be considered a malicious intent to injure any member with whom it competed.").

bore any ill will towards Aimbridge or possessed an intent to harm its business. While Aimbridge was surprised by the March 27, 2024, takeover date, the evidence fails to demonstrate, by clear and convincing evidence, that any secrecy on Provident's part was motivated by an intent to harm.

Further, Aimbridge claims that Scholar and Provident's "poaching" of the Highlander's property-level employees, including interim general manager Scott Marn, demonstrates an intent to injure Aimbridge's business. (Pl.'s Br. at 28–30.) But there is no evidence of such a design, and Scholar's absorption of Highlander's housekeepers, clerks, and kitchen staff can hardly be viewed as affecting, let alone harming, Aimbridge's global operations in any material way. The record establishes that property-level employees are transitioned to the new management company nearly every time there is a management transition. Here, Scholar hired Aimbridge's employees as a matter of course on the management-transition day—and *after* Aimbridge had been terminated as the management company for the Highlander. *See Feddeman & Co. v. Langan Assocs.*, 530 S.E.2d 668, 673 (Va. 2000) (finding no legal malice where the trial court determined that the defendant's actions were taken with no other purpose than to effectuate a planned merger). It is simply standard operating procedure for outgoing management companies to extend job offers to property-level employees, and Aimbridge has not established that it wished to retain these local employees or that they offered specialized skills, expertise, or knowledge that could not be easily replaced.[7] *Cf. Advanced Marine Enters. v.*

[7] Indeed, this is a far cry from a typical business conspiracy case, where defendants poach key senior-level managers or members of the "C-suite." The employees at issue, although invaluable to the operation of the Highlander, had no reasonable prospect of transitioning to other Aimbridge properties considerable distances away from Radford, Virginia.

*PRC, Inc.*, 501 S.E.2d 148, 155 (Va. 1998) (holding that AME intended to harm PRC's business where AME's mass hiring of its engineering department involved poaching a highly specialized workforce and stealing PRC's original documents and intellectual property).

The evidence likewise fails to support Aimbridge's claim that Provident retained Mr. Marn under Scholar's management with an intent to harm Aimbridge's business. Although Mr. Marn contributed significant value and expertise to the operation of the Highlander, he was not a permanent Aimbridge employee who Aimbridge reasonably expected to work at one of its other properties. *Cf. Feddeman & Co.*, 530 S.E.2d at 674 (identifying legal malice in defendants' plan to hire plaintiff's employees "as leverage" where the departure of plaintiff's employees would so adversely impact plaintiff that it would alter its business objectives to prevent their departure); *Advanced Marine Enters.*, 501 S.E.2d at 155 (holding that AME's mass hiring plan requiring PRC's employees to breach their employment contracts, among other harms, constituted legal malice).

The record conclusively establishes that Mr. Marn was committed to a temporary posting at the Highlander, before returning to his retirement in Florida. Mr. Marn was retired when Aimbridge hired him to serve as interim general manager. His role at the Highlander was temporary, and neither he nor any of the parties expected him to remain employed there for longer than was necessary to stabilize its operations. Indeed, Aimbridge was in the process of replacing Mr. Marn to facilitate his return to retirement before Aimbridge learned of the transition. Although Provident sought to retain Mr. Marn under the new management for the Highlander's benefit, there is no evidence that would support a finding that Provident retained Mr. Marn for the malicious purpose of harming Aimbridge's business. Accordingly, no

reasonable factfinder could conclude, by clear and convincing evidence, that Provident and Scholar's actions leading up to the transition were motivated by an intent to harm Aimbridge's business.

Finally, there certainly is no evidence of a "meeting of the minds" as to any desire to harm. To prevail on a claim of business conspiracy, a plaintiff must also prove by clear and convincing evidence that the alleged conspirators "combined, associated, agreed, mutually undertook, or concerted together . . . in such conduct." *Simmons*, 544 S.E.2d at 677. But, here, the record conclusively establishes that Provident insulated Scholar from its contractual dealings with Aimbridge throughout the transition process. Scholar was not privy to the terms of Aimbridge and Provident's HMA or Provident's Notice of Termination, and Scholar was never accurately briefed by Provident on the status of its negotiations with Aimbridge over the HMA's termination.

Instead, uncontroverted testimony establishes that Provident maintained separate communication lines with Aimbridge and assured Scholar that they were reaching an agreement with Aimbridge on their own. (*See* Sharma Dep. at 67:15–20, 120:17–20; Brandeis Dep. at 83:22–84:3; ECF No. 55-15.) *See, e.g.*, *Simmons*, 544 S.E.2d at 672, 677 (finding no meeting of the minds to support a business conspiracy claim where the tortfeasor misrepresented the true purpose of the business with which his attorney assisted). Scholar's failure to inquire more into the circumstances of Aimbridge's dispute with Provident does not render Scholar liable for any wrongful aim that Provident may have harbored, or that its continued involvement *may* have unwittingly facilitated. *See id.* at 672, 677. Accordingly, there is no evidence to demonstrate the existence of a mutual undertaking or meeting of the minds

as to any legal malice, and Aimbridge's business conspiracy claim, too, must fail as a matter of law. Therefore, Scholar and Provident are entitled to summary judgment on both conspiracy claims.

## IV. CONCLUSION

For the reasons discussed above, the court will grant Provident's motion for partial summary judgment and Scholar's motion for summary judgment.

The clerk is directed to forward a copy of this Memorandum Opinion to the parties.

**ENTERED** this 8th day of October, 2026

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE